John G. SULLIVAN, Appellant,

v.

NORTH AMERICAN ACCIDENT INSURANCE COMPANY, Appellee.

No. 2292.

Municipal Court of Appeals for the District of Columbia.

Argued Jan. 19, 1959.

Decided April 21, 1959.

468

Arthur V. Butler, Washington, D. C., with whom H. Mason Welch, J. Harry Welch, J. Joseph Barse, and Walter J. Murphy, Jr., Washington, D. C., were on the brief, for appellant.

Laidler B. Mackall, Washington, D. C., with whom John E. Nolan, Jr., Washington, D. C., was on the brief, for appellee.

Before ROVER, Chief Judge, and HOOD and QUINN, Associate Judges.

QUINN, Associate Judge.

Appellant, an assistant pressman in the printing trade, was insured by appellee under an accident insurance policy which obligated appellee to pay hospital benefits and a monthly indemnity

"[if] the Insured, while this policy is in force, shall sustain bodily injury which is effected directly and independently of all other causes by accidental means and which injury, within twenty days from the date of accident, causes total and continuous disability and prevents the Insured from engaging in any and every kind of business or labor pertaining to his occupation, * * *."

The policy also provided:

"Indemnity for either total or partial loss of time shall not be paid in excess of the time the Insured is under the regular care of a legally qualified physician or surgeon other than the Insured. * * *"

On January 8, 1957, while the policy was in effect, appellant was involved in an accident in which he was crushed between the mechanisms of a printing press. He was immediately taken to a hospital, and according to the examining doctor, he complained mainly of chest pain. He remained in bed until his discharge from the hospital on January 24. The final diagnosis was "severe contusion of the chest." X-rays taken disclosed no fracture or dislocation of the spine but indicated a "questionable defect in the area * * * of the fifth lumbar vertebra." However, no further examination was made of that area at that time.

Appellant testified that after his discharge he experienced considerable pain in the lower part of his back and chest, and that he received regular treatment for it for several months thereafter. On June 18, 1957, he consulted a Dr. Cobey about the continuing pain in his spine. Dr. Cobey at first suspected a "hiatus hernia of the diaphragm," and referred appellant to a Dr. Holtzman. After study, however, this possibility was excluded. Dr. Cobey then prescribed a spinal brace for his back. According to Dr. Cobey, appellant told him three weeks later that after wearing the brace he felt more comfortable and improved. Dr. Cobey also testified that at that time he believed appellant "could go ahead and try" to work at his trade.

Appellant then made six visits to Dr. Holtzman between June 1957 and the middle of the following October. During this period, Dr. Holtzman regarded him as totally disabled, and unable to resume any work. He diagnosed the disability as a "dorsal backache—possible ruptured disc." However, a myelogram operation, performed on appellant at the request of another insurance company, indicated that there was no ruptured disc. Apparently, the operation aggravated his back pain, and as a result appellant was unable thereafter to wear the brace continually.

On October 23, 1957, appellee wrote a letter to a Dr. Warren, a physician of its own choosing, and requested that he examine appellant in order to determine, among other things, whether appellant's disability was bona fide and what his prognosis was. Dr. Warren examined appellant and on October 25, 1957, wrote appellee that " * * * this is a bona fide disability," and that he did " * * * not feel that this man is a malingerer." Dr. Warren then began to treat appellant for both his back injury and a respiratory infection. The treatment for his back was given by a physiotherapist and consisted of heat and massage. On January 7, 1958, appellant stopped seeing Dr. Warren.

Meanwhile, appellant had been paid benefits under his policy from the date of his accident, January 8, 1957, to and including the month of November 1957. On December 3 he received a letter from A. J. Armstrong, appellee's claim manager, which read:

"We have your letter advising that you returned to work on November 25.

"We are enclosing a Release in the amount of $2226.65 which we would ask that you sign and return to us together with your policy.

"We have previously paid you $2193.-32 and the balance of $33.33 will be payable upon receipt of the documents requested.

"Are you still engaged in the Allied Printing Trades? We are obliged to terminate your policy at this time. If and when you have effected a full and complete recovery you may apply for a new policy, if you are still interested, one year hence."

Appellant testified that he telephoned Mr. Armstrong and informed him in effect that he was still unable to work. Appellant claimed that he was told that appellee had confused him with a John Sullivan in Pennsylvania. He was sent another form which Dr. Warren completed and which he signed and returned. However, he never received any further payments from appellee. On February 3, 1958, this suit was filed.

On April 15, 1958, at the direction of his attorney, appellant again consulted Dr. Cobey. X-rays were taken which showed that appellant's condition had considerably worsened and that "a complete instability" of his back had finally occurred. Dr. Cobey testified that the cause of appellant's condition was spondylolisthesis, a forward slipping of the fifth lumbar vertebra. It was explained that spondylolisthesis is a congenital lesion brought about in part by the fusion of the contiguous areas of the is-

chium, and that it predated the accident of 1957; that a person may have spondylolisthesis and not ever be affected by it. However, once the condition is incited by some other factor, the fibrous tissues about the defect are extended, and the vertebrae are no longer held sufficiently close in position. Dr. Cobey stated that in his opinion the accident of January 1957 was the "inciting factor" which brought about the instability of appellant's spine. He also testified that it would be necessary to perform a spinal fusion operation in order to correct this condition. This operation effects a fusion of two or more vertebrae. Following the operation appellant would be disabled for one year until the graft becomes solid, and restricted from full activity for another year.

Appellant testified that he had been unable to work during the entire period following his accident, except for sporadic attempts which proved unsuccessful because of the pain; and that he was finally advised not even to try. Dr. Cobey also testified in effect that he changed his mind on April 15, 1958, from his earlier diagnosis; that the back brace had not enabled appellant to return to work, and that he concluded the only way to restore appellant to health was by a spinal fusion operation.

As we have said, appellee stopped paying benefits in December 1957, and appellant then brought this suit for both the monthly indemnity described above and certain hospitalization benefits. Without detailing the facts, we think it clear that appellant was not entitled to any hospitalization benefits under the policy, and indeed this portion of his claim seems to have been abandoned on appeal. We have set forth at length appellant's evidence concerning his alleged disability on which he based his claim to the monthly indemnity. Appellee introduced nothing in its behalf except the policy.

The trial judge, sitting without a jury, orally stated, among other things, "I do not think that [appellant] injured his back," and "I find that within the definition of the results of the myelogram, and the other evidence that I have considered in its totality, that he is not totally disabled within the meaning of this policy." Ultimately, a judgment was entered for appellee.

■ Appellant contends that these findings are without support in the evidence and should not stand. Generally, questions as to disability are factual and a trial court's conclusions on these matters, when supported by substantial evidence or not clearly erroneous, are binding on a court of review.[1] It is also true, however,

> " ' * * * where the testimony is all one way, and is not immaterial, irrelevant, improbable, inconsistent, contradicted, or discredited, such testimony cannot be disregarded or ignored by judge or jury, and if one or the other makes a finding which is contrary to such evidence, or which is not supported by it, an error results, for which the verdict or decision, if reviewable, must be set aside. To hold otherwise would vest triers of the facts in cases subject to review with authority to disregard the rules of evidence which safeguard the liberty and estate of the citizen. Kelly v. Jackson [ex dem. Morris], 6 Pet. 622, 631, 8 L.Ed. 523.' "[2]

■ Considering first the finding that there was no injury to appellant's back, we can perceive no basis for it. Appellant testified in effect that shortly after the accident he felt considerable back pain; that the condition was so severe that it wholly prevented him from working; that in June 1957 he began wearing a back brace which he still uses. Three doctors corroborated his testimony as to his condition and one, Dr. Cobey, stated that only a spinal operation would correct it. Appellee offered no

1. Occidental Life Ins. Co. of Cal. v. Lame Elk White Horse, 1950, D.C.Mun.App., 74 A.2d 435, 439.

2. Stone v. Stone, 1943, 78 U.S.App.D.C. 5, 8, 136 F.2d 761, 764.

evidence of its own on this point; instead, it contends that appellant's proof did not disclose any "objective evidence" of a back condition until the examination of April 1958 when the first diagnosis of spondylolisthesis was made. The fact that the condition was not precisely diagnosed until April 1958 does not show that it did not exist prior to that date. Indeed, the evidence is uncontradicted and virtually overwhelming that appellant was afflicted with a severe back condition, whether it was recognized by name or not, which persisted from, and was, according to Dr. Cobey, directly traceable to, the accident of January 1957.

Since the finding of "no back injury" is so clearly erroneous, it raises serious doubts as to the validity of the finding that appellant was not disabled. We must assume that the latter finding rests, at least in part, on the first finding. The court also stated that it based the "not disabled" finding on "the results of the myelogram," but manifestly the myelogram did not show that appellant was not disabled, but rather that his troubles, whatever they were, were not caused by a ruptured disc. This fact is established by the later X-rays and examination of April 1958, which indicated that the true cause was spondylolisthesis.

Appellee points to Dr. Cobey's testimony that he believed in June 1957 that appellant "could go ahead and try" to follow his occupation and appellant's attempts to return to work as support for the finding of "no disability," but it is clear that Dr. Cobey's opinion of June 1957 was not his own final opinion, and he stated that he changed his mind completely later on. It is unrefuted that appellant's attempts to return to work were unsuccessful because of the pain involved.

Apart from these points, the circumstances of the case cast considerable doubt on the validity of the finding of "no disability." Prior to his accident appellant was pursuing a trade requiring a strong body and there is no indication that he had any previous back trouble. The severity of the accident is unquestioned. Appellee paid benefits for it of over $2,000, and it has given no reasons as to why, or on the basis of what information, it discontinued payments in December 1957. If, as appellee claimed in its letter of December 3, 1957, appellant had informed it by letter that he had returned to work, appellee never produced the document. Appellee did not file any counterclaim. Its defense relates largely to the period following discontinuance of the benefits, i. e., from December 1957. There is nothing in the record to show that any marked change for the better occurred in appellant at about December 1957; instead, according to appellant and Dr. Cobey, his condition was getting progressively worse.

■ If, therefore, we consider only the evidence bearing on appellant's inability to pursue his occupation, we do not believe the finding of "no disability" here could stand. However, the finding might have been based on the theory that since appellant's condition of spondylolisthesis was a congenital condition predating the accident, it was a cause of his disability; and therefore the accident was not the sole cause, as the policy requires, although the only evidence on the point, Dr. Cobey's testimony, indicated that the accident was the "inciting factor" which activated a condition that would otherwise have remained dormant. If this testimony had been accepted by the court, it could have supported a finding that appellant was disabled by the accident "directly and independently of all other causes."[3] However, the court made no findings whatever on this issue,[4] and there is no indication of any sort that the conclusion of "not disabled" rests on a rejection of Dr. Cobey's testimony; instead, it appears quite likely that it is based in substantial part on the other erroneous reasons described above. In view of these

3. Underwriters at Lloyd's, London, England v. Lyons, 9 Cir., 1957, 248 F.2d 149.

4. Except a finding that appellant's condition was congenital.

grave uncertainties in the record on this issue, it is our conclusion that a new trial is warranted.

Appellee contends that appellant was not entitled to benefits because he was not, as the trial court found, under the regular care of a physician, at least not from December 1957 when the benefits were discontinued. Appellee in effect urges a strict adherence to the policy requirement in this regard, and argues that because appellant stopped seeing Dr. Warren after January 7, 1958, and did not again consult a doctor until the following April, his claim must fail.

In determining the legal effect to be given to a policy requirement of this sort, courts have not reached a uniform conclusion. A literal reading of the provision would make compliance with it an absolute necessity without any qualifications. On the other hand, there is a group of decisions which give the requirement of regular care by a doctor a more liberal interpretation. Under this view, if the existence of the disability is established, and there is a reasonable ground to excuse regular treatment by a physician, recovery for the disability will not be barred by a failure to comply literally with the policy provision. This rule is justified, first, on the principle that the law does not require the performance of futile acts, and, secondly, because the real purpose of the medical care clause is evidentiary, to guard against fraudulent claims; consequently, if the claim is meritorious, there is no need to hold the insured to strict compliance with the provision.[5] We believe that these reasons are sound, and therefore we will follow the rule of liberal construction.[6]

In the present case, assuming that appellant was disabled within the meaning of the policy, we think there were more than adequate grounds to excuse his failure to submit to regular attendance and treatment by a doctor. Appellant testified that his chief reason for discontinuing his visits to Dr. Warren was that, since appellee had stopped paying him benefits, he was no longer able to afford the expense. Such a reason is valid.[7] Appellee's attempt to use the consequences of its own refusal to pay the benefits as a means of justifying its action is hardly commendable. Appellee claims Dr. Warren offered to treat appellant without charge, but Dr. Warren's statement, made on deposition, does not appear to support the contention.[8] When questioned on this point at the trial appellant denied the claim, and testified that a charge was contemplated.

Further, it does not appear that any regular medical treatment other than the wearing of the back brace, would have been of any benefit. Dr. Cobey stated that only a spinal fusion operation would correct the trouble. We believe both of these reasons justified the noncompliance with the policy provision relating to medical care.

Reversed with instructions to grant a new trial.

5. See, for example, Yager v. American Life Insurance Association, 1957, 44 N. J.Super. 575, 131 A.2d 312; Massachusetts Bonding & Insurance Co. v. Springston, Okl., 1955, 283 P.2d 819; see, also, annotation, 115 A.L.R. 1062.

6. We do not believe that Metropolitan Life Ins. Co. v. Bovello, 1926, 56 App. D.C. 275, 278–279, 12 F.2d 810, 813–814, 51 A.L.R. 1040, and World Insurance Company v. Carey, 1955, D.C.Mun. App., 118 A.2d 390, 392, are precedent to the contrary, for in those cases the insured was under the regular care of a doctor and thus the issue was not presented.

7. See North American Acc. Ins. Co. v. Henderson, 1937, 180 Miss. 395, 177 So. 528.

8. Dr. Warren's exact statement was: "We tried to help him. I was disappointed when I started treating him and he did not come back. I assured him, though, that I was not being paid by the Insurance Company; that I would treat him and try to rehabilitate him. * * *"